UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
UNITED STATES OF AMERICA,


              -against-                                S1 16-cr-0212 (LAK)


KAVONE HORTON, a/k/a "Styles,"

                              Defendant.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x


## MEMORANDUM OPINION


        Appearances:


                    Hagan Scotten
                    Rachel Maimin
                    Micah W.J. Smith
                    Jessica Feinstein
                    Drew Johnson-Skinner
                    Assistant United States Attorneys
                    PREET BHARARA
                    UNITED STATES ATTORNEY


                    Gary G. Becker
                    GARY G. BECKER, P.L.L.C.
                    *Attorney for Defendant*


LEWIS A. KAPLAN, *District Judge.*

        Kavone Horton is one of 57 individuals indicted in this case.  He and others are

alleged to be members of 2Fly YGz ("2Fly"), a violent street gang.  He is charged with (a)

racketeering conspiracy, (b) narcotics conspiracy, (c) narcotics distribution within 1000 feet of a

school, playground, and public housing development, and (d) use of firearms in furtherance of the

2

racketeering and narcotics conspiracies.[1]

        Horton was arrested on April 27, 2016, and presented before the magistrate judge. The government sought an order of detention, which Horton opposed.  Following a hearing on April 29, 2016, the magistrate judge ordered Horton released subject to certain conditions, including home detention, electronic monitoring, strict pretrial supervision, and drug testing, among other things.[2] The government sought review under the Bail Reform Act and this Court, after *de novo* review that included further proceedings, ordered Horton detained pending trial based on its finding "by clear and convincing evidence that no condition or combination of conditions will reasonably assure the safety of the community if [Horton] were released from custody."[3]  Horton appealed.  The Second Circuit, in a summary order, remanded the case with instructions that this Court vacate its prior detention order and hold further proceedings.[4]

*Facts – The Prior Proceedings*

I.    *April 29 Bail Hearing*

        During Horton's bail hearing before the magistrate judge, the government proffered, on the basis of cooperating witness testimony, social media postings, and New York City Police

---

[1]    DI 5.

    The government has indicated that it intends to supercede the indictment as to Horton and nineteen other defendants who, it believes, "have ordered, committed, or aided and abetted murders, attempted murders, or assaults in aid of racketeering."  DI 519.  As it has not done so yet, the Court does not here consider those potential new charges.

[2]    DI 180.

[3]    DI 203.

[4]    DI 353.

Department records, that Horton (a) is a member of 2Fly, (b) participated in street robberies and possessed guns, (c) was present at and participated in a March 2012 brawl with a rival gang that resulted in a fatal stabbing, (d) was present at an August 2012 nonfatal shooting involving three victims, at least two of whom were rival gang members, (e) was arrested in 2014 for possession of a "dangerous weapon," and (e) in April 2015 punched a then-girlfriend in the face and was escalating the violence at the time she reported the incident to the NYPD.[5]  The government submitted also two photographs of Horton as corroborating evidence of his gang involvement.[6]

Horton arguably contested some elements of the government's proffer and asked the magistrate judge not to credit it.[7]  But principal elements of Horton's contention that he should not be detained were the fact that he has no criminal record and a claim that he is not the same person in 2016 as perhaps he had been earlier.  His counsel proffered that (a) the violent incidents at which he allegedly was present or involved took place several years ago, (b) Horton in 2014 moved from the Bronx, the locus of his alleged criminal activity, to Manhattan, (c) he has been employed continuously for the past three or four years, (d) he lived with his mother and sister, both of whom

---

[5]

Bail Hr'g Tr. 2:25-4:6, 7:4-14, 18:2-9 Apr. 29, 2016.

[6]

*Id.* at 7:4-14.

[7]

*Id.* at 5:1-6:12.

Specifically, defense counsel challenged the government's statements as to the March and August 2012 incidents on the basis that they were "based presumably on hearsay."  He argued further that even if the proffer as to those incidents were credited, mere presence at the scene of a stabbing or shooting would not have been a crime.  Counsel argued also that the April 2015 domestic violence report lacked credibility because Horton was not arrested despite what he called the NYPD's alleged "strict policy" of making an arrest when "any kind of credible report of domestic violence is made."  Counsel conceded Horton's 2014 sealed arrest, but sought to minimize its significance by arguing that the "dangerous weapon" in question had been a pocket knife and that the case ultimately was dismissed.

4

are employed gainfully, until the time of his arrest, and (e) he was enrolled full-time at the Borough of Manhattan Community College at the time of his arrest and recently had been offered employment.[8]

On that record, the magistrate judge ordered conditional release.[9]

II.     *May 3 Bail Hearing*

The government applied for review of the release order.  On May 3, 2016, this Court held a hearing to determine the matter *de novo*.[10]

During the May 3 hearing, the government proffered additional information in support of detention:

- Horton had admitted his presence at the March 2012 brawl and fatal stabbing to law enforcement officers.[11]

- Information derived from the government's investigation will establish that 2Fly members engage in a practice called "mobbing," that is, gathering in large groups to travel to rival gang territory to commit violence.[12]  2Fly's

---

[8]

*Id.* at 8:18-10:4, 10:15-13:20.

Horton submitted two exhibits containing proofs of address, student enrollment, and certain employment, as well as examples of his schoolwork from BMCC.  DI 214-1, 214-2.

[9]

Bail Hr'g Tr. 20:12-21:3; *see also* DI 180.

[10]

*United States v. Leon*, 766 F.2d 77, 80 (2d Cir. 1985).

[11]

Bail Hr'g Tr. 5:7-8 May 3, 2016.

[12]

*Id.* at 5:8-12.

practice of mobbing, in the government's submission, tends to support Horton's membership in 2Fly and his involvement in the March and August 2012 incidents because each involved group violence against rival gang members.

- Cooperating witness testimony will establish that Horton held guns for the gang.[13]  Additionally, an intercepted March 9, 2016 call, the government claims, will establish that Laquan Parrish, the alleged leader of 2Fly, asked Horton to bring him a gun in Horton's possession on at least one occasion.[14]

- Social media activity, such as a March 2016 posting of "F L Y E R S" on Horton's Facebook account, evidences Horton's continued involvement with 2Fly.[15]

Horton again opposed the government's proffer and asked the Court not to credit it.[16]

In support of release, however, Horton largely stood on his original proffer and exhibits.[17]

---

[13]

*Id.* at 7:24-8:2.

[14]

*Id.* at 8:7-16.

The call is open to different interpretations, as its language is not, to use a phrase, in the "King's English."  Its meaning is hotly contested.

[15]

*Id.* at 8:18-23.

[16]

*Id.* at 9:10-10:12.

[17]

Defense counsel disputed that Horton placed the March 9 intercepted call because the line sheets identified the caller as "Brady."  *Id.* at 9:22-10:2.  To bolster its assertion that the caller in fact was Horton, the government proffered that the phone number from which the call was made was stored in Laquan Parrish's phone as "Styles"—Horton's alias—and is subscribed to by Horton's mother.  *Id.* at 15:2-14.

6

During the hearing, the Court questioned defense counsel about his understanding of the showing a defendant must make to rebut the Bail Reform Act's presumption, in cases like this, in favor of detention and the subsequent significance of the presumption where rebutting evidence is presented.  The Court engaged counsel in the following dialogue:

> "THE COURT:  Look, there is a statutory presumption that says unless I am really seriously convinced that letting your guy out on some conditions will reasonably ensure the safety of the community, he is in.  You're telling me that the practical effect of that presumption is zero, that what has to happen here is in order to keep him in the government has to satisfy the burden of proof of the opposite proposition.
>
> MR. BECKER:  I don't think there is any question that [under Second Circuit case law], the presumption . . . once rebutted . . . even a minimal degree while it remains in the case does not carry the government's burden. . . .
>
> THE COURT:  So your position is that in a presumption case, the government comes in and says, Here is the presumption, and you stand up and you proffer that your client didn't do it, minimal evidence, and therefore he is entitled to be released?
>
> MR. BECKER:   Well, the question is whether or not that would rebut the presumption."[18]

This colloquy clarified for the Court (a) counsel's position that Horton need make only a minimal showing in order to rebut the statutory presumption, and (b) counsel's concession that the presumption, even once rebutted, remains a factor for the Court to consider in determining whether the government has sustained its burden of proof by clear and convincing evidence, although it is not, in counsel's view, alone sufficient to carry the government's burden.

The Court reserved decision at the conclusion of the May 3 proceedings.  On May 4, 2016, however, it entered a written order that Horton be detained pending trial.[19]  It expressly noted that the grand jury found probable cause to believe that the defendant committed offenses that

---

[18]   *Id.* at 13:4-23.

[19]   DI 203, at 1.

give rise, under the Bail Reform Act, to the presumption that "that no condition will reasonably assure the defendant's appearance and the safety of the community."[20]  It went on to state:

> "Without limiting the generality of the foregoing, the Court is persuaded that the bail conditions imposed by the magistrate judge, or any others that could be devised, would not address adequately that <u>the grand jury found probable cause to believe that the defendant committed the four serious offenses charged in the indictment over a protracted period of time as part of a violent gang</u>.  The Court, although mindful of the possible length of pretrial detention in this case, finds, <u>for that and additional reasons advanced by the government, [that there would be] a 'strong probability that [defendant] will commit additional crimes if released,' no matter the conditions imposed</u>.  *See United States v. Colombo*, 777 F.2d 96, 99 (2d Cir. 1985)."[21]

## III.    *The Appeal*

Horton appealed the Court's detention order.[22]   The Second Circuit expressly acknowledged that this Court had "stated the correct standards governing bail" in its written order of May 4, 2016.[23]  Nonetheless, the panel construed the May 3 colloquy, in which the Court probed defense counsel on his understanding of the Bail Reform Act's rebuttable presumption, as perhaps evidencing a misplacement of the burden of persuasion.  Notwithstanding the Court's application in the May 4 order of "the correct standards," the Second Circuit remanded the case for the Court to "reconsider bail under the correct burden of persuasion."[24]

---

20

     *Id.* at 1.

21

     *Id.* at 2.

22

     DI 246.

23

     *United States v. Horton*, No. 16-1574, __ F. App'x __, 2016 WL 3476334, at *1 (2d Cir. June 25, 2016).

24

     *Id.* at *2.

IV.     *Proceedings on Remand*

      Both sides made further submissions and reargued the matter extensively on remand.

    A.     *Further Submissions by the Government*

      The government supplemented its proffer essentially as follows:

      First, it said that, based on information from cooperating witnesses, Horton was "a full-fledged member of 2Fly who used the specialized greetings reserved—on pain of violent punishment—for 2Fly members, and affiliated with the leaders and core members of the gang."[25] That anticipated testimony, according to the government, is corroborated by a court-authorized wiretap that captured "Horton interacting with 2Fly's leaders and members."[26]

      Second, new sources of information now, according to the government, will establish that "Horton not only accompanied his fellow 2Fly members to commit [the August 2012] shooting, but personally fired at the victims."[27]  A cooperating witness, who had not been cooperating with the government at the time of the initial bail hearings, is expected to testify that he heard from several 2Fly members that Horton fired shots.[28]  This witness will testify also that Horton personally expressed to him a fear that someone would tell investigators about his role in the August 2012 shooting before he obtained bail.[29]  Another cooperating witness will testify that other 2Fly members

---

[25]    DI 358, at 5.

[26]    *Id.* at 5-6.

[27]    *Id.* at 6.

[28]    Bail Hr'g Tr. 11:17-13:2 June 29, 2016 [DI 432].

[29]    DI 358, at 6.

told him that Horton fired shots during the August 2012 incident.[30]  A third cooperating witness is expected to testify that other 2Fly members told him that Horton did a shooting in the 2012–2013 time period, though the witness was uncertain whether it was the August 7, 2012 shooting or a separate incident.[31]  The government contends that this witness's anticipated testimony, when taken together with the two other cooperating witnesses' statements, also tends to implicate Horton in the August 2012 shooting.

Third, cooperating witness testimony, the government said, will show Horton's participation in other 2Fly violent acts including "two robberies and two brawls with rival gangs personally observed by a cooperating witness."[32]  According to that expected testimony, Horton attempted to stab a rival gang member with a kitchen knife during one brawl.[33]

Fourth, the government indicated that cooperating witnesses will testify that they observed Horton in possession of a firearm on multiple occasions, including in his home, at the apartment of another 2Fly member, and "concealed in a trash can near the . . . playground where Horton and others sold drugs."[34]  The government proffered additional testimony that "the gun Horton kept was considered *his* gun, albeit one that other 2Fly members could also use in

---

[30]
    DI 432, at 16:2-24.

[31]
    DI 432, at 17:3-14.

[32]
    DI 358, at 6.

[33]
    *Id.* at 7.

[34]
    *Id.*

furtherance of the gang's interests."[35]  In the last analysis, a cooperating witness will testify that he observed Horton carrying a gun that resembled one later seized in a search.  That seized gun subsequently was matched through ballistics testing with rounds recovered from the August 2012 shooting.[36]

Fifth, the government proffered that during Horton's October 2014 arrest, which came after his move from the Bronx, Horton told the arresting officer that he was carrying the knife "for protection."[37]

Sixth, the government contends that Horton's Facebook posts tend to rebut counsel's claim that Horton abandoned his violent ways when he moved out of the Bronx in 2014.[38]

The government submitted, in addition to its proffer, line sheets from intercepted calls allegedly between Horton and co-defendants.[39]

B.      *Further Submissions from Horton*

Defense counsel supplemented his proffer essentially as follows:

First, as to the efficacy of home detention with electronic monitoring, according to a coordinator at SDNY Pretrial Services, "the system in place alerts the assigned Pretrial Services Officer in real time, twenty-four hours a day, if an electronically monitored pre-trial releasee leaves

---

[35]     *Id.* at 7 n.6.

[36]     *Id.* at 7.

[37]     *Id.* at 9.

[38]     DI 477; DI 477-1.

[39]     DI 358-1; DI 477-1.

his home when he is not supposed to."[40]

Second, Horton never was charged with weapons possession.[41]  In October 2014, he was arrested for "allegedly trespassing on public housing property."[42]  During a search incident to the arrest, the officer seized what defense counsel called a "small black legal pocketknife."[43]  The officer determined ultimately that "no crime had been committed and the matter was terminated in [Horton's] favor and the record sealed . . . ."[44]

Third, the April 2015 domestic incident report quotes the complainant "as stating that, to her knowledge, [Horton] never possessed a firearm or weapon of any kind."[45]  Moreover, the defense says that the complainant "views the incident in question as long forgotten," does not believe Horton presents a danger, and "has no interest in seeing [Horton] prosecuted."[46]

Fourth, Horton was said to have been present at the March 2012 incident because he "had gone to attend a social event," which turned into a brawl.  Furthermore, a report produced in

---

[40]  DI 363, at 4.

[41]  *Id.*

[42]  *Id.*

[43]  *Id.*

[44]  *Id.*

[45]  *Id.* at 5.

[46]  *Id.*

In an earlier letter to the Court, the government had expressed its understanding that the NYPD would arrest Horton on the basis of the April 2015 domestic violence report if he were released pending trial.  DI 358, at 9.

discovery after the initial detention hearing states that the NYPD determined that the fatal stabbing "constituted a lawful act of self-defense."[47]

Fifth, a search of Horton's Bronx apartment conducted in error in April 2013 yielded no guns, drugs, or other contraband.[48]   Likewise, a search of Horton's Manhattan apartment following his arrest produced "no firearm or any other incriminating evidence, and [Horton] denies that he ever owned a firearm."[49]

Sixth, in the months and weeks leading up to Horton's arrest, he pursued "employment opportunities and enlistment in the United States Army."[50]   Horton's Army interviewer, after reviewing his paperwork, which included his arrests as a juvenile, recommended approving Horton's enlistment.

Seventh, several of Horton's Facebook posts and email exchanges in the weeks and months before his arrest in April 2016, according to defense counsel, "demonstrate his commitment to [] work, school, and a law-abiding life."[51]

Horton submitted, in addition to counsel's proffer, documentary evidence in the form of Facebook posts, email exchanges, and Internet search results.  He offered also to produce his mother, who would testify that she frequently cleaned a sofa in the cushions of which—according to the proffered testimony of one or more unidentified government witnesses—Horton stored one

---

[47]
DI 363, at 7.

[48]
DI 474, at 5.

[49]
DI 363, at 8.

[50]
DI 437, at 1.

[51]
DI 481; DI 481-3; DI 481-4.

13

or more guns, but never saw any.[52]


C.      *The Court's August 11 Order*

In letters to the Court, Horton contended that he had challenged the government's proffer sufficiently and therefore could not be detained except on the basis of findings following what he termed a "full-blown evidentiary hearing."[53]  Notwithstanding its two prior bail hearings, the Court gave each party another opportunity to submit evidence, including any affidavits or declarations, and to identify any witnesses whom it wished to present and any adverse witnesses it wished to examine in open court.[54]

The government filed two sworn declarations of law enforcement officers who participated in interviews of the principal cooperating witnesses referenced in the government's proffer.[55]  It submitted also archived posts from Horton's Facebook account obtained through a search warrant.  It chose not to present any live testimony.

Horton submitted the complaint from a civil action his mother had filed against the City for an alleged unlawful search along with a general release she signed, purportedly in settlement of that civil action.  Horton asked to cross-examine the government's cooperating witnesses and the law enforcement officers who filed declarations.

---

[52]

       DI 451.

[53]

       *Id.*

[54]

       *Id.*

[55]

       DI 465-1; DI 465-2.

D.      *New Letter and Response*

On September 29, 2016, the government updated the Court with additional facts regarding Horton's alleged participation in the August 2012 shooting.[56]  During a proffer session, a would-be cooperator from rival gang Big Money Bosses told the government that (1) he was present for the August 2012 shooting, (2) he recalls four or five assailants participating in the shooting, (3) he recognized defendants Laquan Parrish, Sean McIntosh, and Jaquan McIntosh as three of the assailants, (4) he got only a brief glimpse—approximately five seconds—of the remaining one or two assailants, and (5) he believes, but is not certain, that he would be able to recognize the remaining one or two assailants from a photograph.[57]  When shown a photograph of Horton, the would-be cooperator recognized Horton as a member of 2Fly but did not recognize him as one of the members of 2Fly present for the August 2012 shooting.[58]

Writing in response to the government's letter, defense counsel argued that the failure of this alleged eyewitness to place Horton at the scene of the August 2012 shooting weakened "appreciably" the government's claim that Horton participated in the incident.[59]  "This disclosure is quite significant," according to defense counsel, "because in seeking [Horton's] detention, the government has placed great stock in his alleged participation in the August 2012 shooting."[60]

---

[56]      DI 521.

[57]      *Id.*

[58]      *Id.*

[59]      DI 529.

[60]      *Id.*

As an aside, defense counsel added that the government's recently filed "Enterprise Letter"

15

*Discussion*

I.    *Legal Standard*

A court shall order pretrial detention if, after a hearing, it finds that the government has established by clear and convincing evidence that the defendant presents a danger to the community, and that "no condition or combination of conditions will reasonably assure . . . the safety of any other person and the community."[61]  In determining whether there are conditions of release that would reasonably assure the safety of any person and the community, the Court must consider the factors enumerated in Section 3142(g), including the nature and circumstances of the charged offenses, the weight of the evidence against the defendant, the history and characteristics of the defendant, and the nature and seriousness of the danger posed by the defendant's release to any person or the community.[62]

Where, as here, there is probable cause to believe that the defendant has committed certain narcotics and weapons offenses,[63] the statute creates a rebuttable presumption that no condition or combination of conditions will reasonably assure the safety of the community.[64]  "The defendant bears the burden of producing evidence to rebut that presumption.  If the defendant produces such evidence, the presumption does not vanish; rather, it 'remains a factor to be

---

indicates that it does not intend to prove at trial "a single act of violence" committed by Horton after his move to Manhattan.

[61]    18 U.S.C. § 3142(e), (f).

[62]    18 U.S.C. § 3142(g).

[63]    Count Two of the indictment charges Horton with violating 21 U.S.C. § 841(b)(1)(A), an offense that carries a maximum term of life imprisonment.  Count Four of the indictment charges Horton with violating 18 U.S.C. § 924(c)(1)(A)(iii).

[64]    18 U.S.C. § 3142(e)(3)(B).

considered among those weighed by the district court.'"[65] "At all times, . . . the government retains the ultimate burden of persuasion by clear and convincing evidence that the defendant presents a danger to the community."[66]

## II.     The Nature of the Proceedings to Date

As the foregoing makes clear, the proceedings with respect to Horton's release or detention have been anything but summary. Both sides have made extensive proffers, important elements of which are unchallenged. The government has submitted sworn declarations of two law enforcement officers detailing their conversations with three as-yet unidentified cooperating witnesses, thus taking the government's submission as to the expected testimony of those witnesses beyond unsubstantiated claims that prosecutors frequently rely upon in detention hearings. Horton has proffered the testimony of his mother in an effort to rebut the claim that he kept a gun in the apartment he shares with her, and the Court assumes that Horton's mother would testify as claimed by defense counsel were she called as a witness. Horton nevertheless contends that, in order to test the reliability of the government's proffer, the Court must require that the government either produce live witnesses subject to cross-examination—the three cooperating witnesses identified by the government as CW-1, CW-2, and CW-3, as well as the two law enforcement officers—or furnish

---

[65]     *Horton*, 2016 WL 3476334, at *1 (quoting *United States v. Mercedes*, 254 F.3d 433, 436 (2d Cir. 2001)).

[66]     *United States v. English*, 629 F.3d 311, 319 (2d Cir. 2011) (internal quotation marks omitted); *Horton*, 2016 WL 3476334, at *1.

affidavits from the three cooperators.[67]  He contends that such evidence is "required by *Martir*[68] and *LaFontaine*,[69] given that [Horton] . . . has unquestionably disputed the *bona fides* of the government's claims."[70]  Failing that, he argues, he must be released.  Given the record here, this Court disagrees.

The Court "has broad discretion with respect to the manner in which it obtains information bearing on the relevant factors" in conducting a detention hearing.[71]   As the Circuit has written, "[a] detention hearing need not be an evidentiary hearing.  While the defendant may present his own witnesses and cross-examine any witnesses that the government calls, either party may proceed by proffer and the rules of evidence do not apply."[72]  This flows from the fact that the thrust of the Bail Reform Act "is to encourage informal methods of proof.  Congress did not want detention hearings to resemble mini-trials."[73]  Nor is a detention hearing to be used "as a discovery tool for the defendant."[74]

---

67      DI 474, at 1.

68      *United States v. Martir*, 782 F.2d 1141 (2d Cir. 1986).

69      *United States v. LaFontaine*, 210 F.3d 125 (2d Cir. 2000).

70      DI 437, at 6.

71      *United States v. Bellomo*, 944 F. Supp. 1160, 1163 (S.D.N.Y. 1996) (citing *Martir*, 782 F.2d at 1145).

72      *United States v. El-Hage*, 213 F.3d 74, 82 (2d Cir. 2000); *see also, e.g.*, *United States v. Ferranti*, 66 F.3d 540, 542 (2d Cir. 1995); *Martir*, 782 F.2d at 1145.

73      *Martir*, 782 F.2d at 1145.

74      *Id.*

None of this, of course, is to say that a district court may rely uncritically on unsubstantiated, disputed claims by either the government or a defendant.  Despite the informality of detention hearings, the Court "retains the responsibility for assessing the reliability and accuracy of the government's information, whether presented by proffer or by direct proof."[75]  Where the Court determines that the overall reliability of a proffer "is in question," it should "selectively insist[] upon the production of the underlying evidence or evidentiary sources."[76]  The Court in substance has done so here.  Thus, the question is whether, considering the overall reliability of the proffer, the Court is persuaded that the government has carried its burden of persuasion.

In considering this question, it is useful to begin with the fact that the Court had the benefit of an extensive proffer by the government, large elements of which—as will appear in more detail below—are not substantially disputed and are corroborated by other evidence.  Thus, this is not a case, like *Martir*, in which the government's proffer is "general and conclusory."[77]

Passing more particularly to the persuasive force of the proffer of the anticipated testimony of the cooperating witnesses, recognizing that neither they nor the law enforcement officers who have summarized what the witnesses have said in interviews have been subjected to cross-examination, it is important even in this context to acknowledge that this is not a situation such as *Martir*, where the government's proffer failed to describe or summarize the anticipated trial

---

[75]

     *Id.*

[76]

     *Id.* at 1147 (quoting *United States v. Acevedo-Ramos*, 755 F.2d 203, 207 (1st Cir. 1985)); *see also LaFontaine*, 210 F.3d at 131.

[77]

     782 F.2d at 1147.

19

testimony of its witnesses "in even moderate detail."[78]  To the contrary, its proffer here as to the anticipated testimony is detailed, and it is supported in some important respects (albeit certainly not in every detail) by line sheets from the court-authorized wiretap, Facebook messages and posts, and photographs, as well as essentially unchallenged aspects of the government's proffer that support detention.  In the Court's judgment, the sworn declarations of the officers as to the anticipated cooperator testimony, taken in the context of this record, is an appropriate compromise between the "mini-trial" and revelation long in advance of trial of the identities of the cooperating witnesses that Horton seeks, on the one hand, and the need for reliable information where Horton's liberty prior to trial is at stake.  The Court finds no substantial basis to doubt the overall thrust of the officers' sworn summaries.

Horton's response, in contrast, consists largely of "general denials of the substantive information contained in the statements, which this Court finds go to the ultimate weight afforded the statements, not to their reliability at the proffer stage."[79]  In consequence, the Court is unpersuaded that live testimony or additional affidavits are necessary for it to fulfill its obligation of ensuring the reliability of the government's information.  The Court therefore turns to evaluation of the evidence before it.

III.     *Safety of Others and the Community*

The Court finds, based on the indictment, that Section 3142(e)(3)(A) and (B) create a rebuttable presumption that no condition or combination of conditions would reasonably assure

---

[78]

> *Id.*

[79]

> *United States v. Goba*, 240 F. Supp. 2d 242, 248 (W.D.N.Y. 2003).

20

the safety of the community if Horton were released.[80]  By coming forward with evidence of

Horton's lack of any prior criminal convictions and his recent enrollment in community college,

among other things, the Court assumes that Horton has met his "limited burden of production . . . to

rebut that presumption."[81]  Nevertheless, upon consideration of the factors enumerated in Section

3142(g), as set forth below, and the weight given the presumption, though rebutted, the Court finds

by clear and convincing evidence that Horton presents a danger to the community, and that no

condition or combination of conditions will reasonably assure the safety of the community in the

event of his release.


     A.     *Danger Posed by the Defendant's Release*

     First, of great importance and not disputed by Horton, is the fact that 2Fly exists and

is a violent street gang whose members perpetrate violence, distribute narcotics, and commit other

crimes primarily in the vicinity of the Eastchester Gardens housing project in the Bronx.  Nor, apart

from defense counsel's conclusory, unsubstantiated denials,[82] does Horton dispute that he was a

member of 2Fly at least until 2014, at which point, counsel contends, he stepped away from gang

life.  That alone, of course, does not carry the government's burden.  But there is quite a lot more.

---

[80]

     *United States v. Contreras*, 776 F.2d 51, 55 (2d Cir. 1985) (holding that "the presence of
an indictment returned by a duly constituted grand jury conclusively establishes the
existence of probable cause for the purpose of triggering the rebuttable presumptions set
forth in § 3142(e)").

[81]

     *Mercedes*, 254 F.3d at 436.

[82]

     The most specific denial defense counsel offers is his contention that the government has
not disclosed how or when Horton joined 2Fly, has not claimed Horton has any gang
tattoos, and has not identified any pre- or post-arrest statements in which Horton has
admitted his gang membership.  DI 437, at 7.

Multiple cooperating witnesses are expected to testify to Horton's gang membership based on his participation in an initiation ritual and his use of 2Fly's specialized greetings.[83]  The government relies also on photographs of Horton posing with an individual wearing what it contends is 2Fly gear,[84] messages on Horton's Facebook account from as recent as March 16, 2012, allegedly referencing 2Fly,[85] wiretapped calls between Horton and other alleged members of 2Fly from as recent as March 18, 2016,[86] and anticipated testimony that will establish Horton's presence at altercations between 2Fly and other gangs, including his admitted presence at the March 2012 fatal stabbing.[87]  The Court credits those representations.  Furthermore, defense counsel's assertion that Horton cut ties with 2Fly in 2014 is contradicted by the wiretapped calls within several weeks before Horton's arrest, which, according to the government, capture Horton speaking with the alleged leader of 2Fly about being present in the Bronx and in the company of other 2Fly members, ready to meet up at a moment's notice.[88]  The Court finds that Horton's membership in 2Fly and his

---

[83]

See, e.g., DI 465-1 ¶ 2(a) (initiation ritual); DI 465-2 ¶ 2(a) (specialized greetings).

[84]

Bail Hr'g Tr. 7:4-14 Apr. 29, 2016 (describing photos presented to the magistrate judge of Horton with an individual wearing what the government contends is a 2Fly shirt).

[85]

DI 358, at 6 (describing co-defendant Jayvon Carter's affixing of "F L Y E R S" on photo Horton posted on Facebook).

[86]

DI 358-1 (line sheets from wiretapped calls on March 9, 2016, March 16, 2016, and March 18, 2016, allegedly between Horton and Laquan Parrish).

[87]

DI 465-1.

[88]

According to the government: (1) line sheets from a March 9, 2016 call capture Horton telling Laquan Parrish that he was present in the Bronx with other 2Fly members, see DI 358-1, at 4-5 ("[HORTON]: I'm in the V. . . . I'm in the Valley."), (2) line sheets from calls on March 16, 2016, capture Laquan Parrish summoning Horton, who was in the Bronx at the time, to meet him, see DI 358-1, at 10 ("PARRISH: Where you at? [HORTON:] . . . I'm in the net. . . . I'll slide on right now."); DI 358-1, at 13 ("[HORTON]: . . . I had to go grab

continued involvement weigh in favor of finding that he is a serious danger to the community.

Second, Horton does not dispute that three individuals were shot in a public park during a violent altercation between members of 2Fly and a rival gang on August 7, 2012.  Nor does Horton, apart from his counsel's conclusory denial, seriously contest that he was present at that shooting.  At issue is whether Horton fired shots at the three victims.  Based on the anticipated testimony of three cooperating witnesses—who law enforcement officers swear have provided reliable, corroborated information in the past—the government contends that he did.  Two cooperators, CW-1 and CW-3, are expected to testify that, among other things, other 2Fly members who participated in the shooting told them that Horton fired a gun during the incident.  A third witness, CW-2, is expected to testify that, among other things, other 2Fly members told him about Horton's involvement in a shooting, which the government believes to be the August 2012 shooting.[89]

Defense counsel asks the Court not to credit the government's proffer, which he says varies from its initial proffer at the May 3 hearing, because it is based on hearsay statements from unidentified cooperating witnesses whose reliability, he claims, is untested.  He contends also that proffered evidence tends to rebut the government's claim that Horton was a shooter: (a) Horton's mother will testify that she frequently cleaned the apartment they shared and never saw any gun, and (b) officers twice searched Horton's apartment, once in 2013 by mistake and once after Horton's arrest, but never found any contraband, let alone a gun.  In the last analysis, defense counsel places great weight in the government's most recent disclosure that a would-be cooperating witness from

_____

[Frenchy's phone].  I'm coming to the first right now, though."), and (3) line sheets from a March 18, 2016 call capture Horton telling Laquan Parrish that he was present in the Bronx, *see* DI 358-1, at 16-17 ("[HORTON]: I'm in the hood.  You know where I'm at.").

[89]    CW-2 could not say for sure whether it was the August 2012 shooting.

rival gang Big Money Bosses ("CW-4") claims to have been present at the August 2012 shooting but did not recognize Horton as one of the 2Fly members involved.[90]  According to defense counsel, the government's claim that Horton was a shooter "becomes appreciably weaker" in view of "the failure of the eyewitness to the shooting to place [Horton] at the scene."[91]

While CW-4's proffered statement has some exculpatory weight, the Court finds it to be minimal.  Accepting for these purposes that CW-4 was present at the August 2012 shooting and thus has personal knowledge of the incident, CW-4 claimed to have gotten but a brief glimpse—only about five seconds—of the one or two unidentified 2Fly assailants.  Although he suggested that he might be able to recognize the assailants from a photograph, he was not certain he could do so.  Moreover, the incident in question took place over four years ago, yet this is the first time, as far as the Court can tell, that CW-4 has been asked to make an identification.[92]

Against CW-4's statements stands the proffered testimony of three individuals.  Although none of the three cooperators claims to have been present at the shooting, two of the cooperators learned of Horton's involvement directly from other 2Fly members who were present at the incident—and presumably better able to identify Horton, their fellow 2Fly member, than a rival gang member.[93]  While CW-4's identification came after the fact, the cooperators learned of

---

[90]

DI 529.

[91]

*Id.*

[92]

The Court notes too that it is unclear whether CW-4 was shown a recent photograph of Horton, or one of Horton at age 14, when the shooting took place.

[93]

The government contends that the statements made by other 2Fly members to the cooperating witnesses would be admissible as co-conspirator statements under Fed. R. Evid. 801(d)(2)(e).  DI 432, at 12:9-19.

Horton's involvement in the August 2012 shooting, according to the government, contemporaneously with the incident.[94]  Furthermore, the government contends that Horton's involvement in the shooting was well known within 2Fly.[95]

Moreover, the government has proffered other testimony from the cooperators that tends to support its contention that Horton fired a gun during the August 2012 incident.  The government expects that CW-1 will testify that a different 2Fly member told him that Horton participated in another shooting, approximately two or three years ago, in the vicinity of Boston and Gun Hill Roads.  CW-1 is said to have personally observed Horton in possession of a firearm on many occasions.  CW-3, who already was in federal custody at the time, is expected to testify that shortly after Horton's arrest, Horton expressed concern to CW-3 that others would implicate him in the August 2012 shooting.  CW-3 will testify also that Horton told him he hoped to obtain bail before that occurred.  CW-2 will testify that he observed Horton in possession of a firearm, which Horton showed to other 2Fly members, on at least one occasion.  In addition, a cooperating witness is said to have seen Horton carrying a gun that resembled a firearm seized during a later search.  According to the government, ballistics testing matched that firearm with rounds recovered from the August 2012 shooting.  Taken as a whole, therefore, the government's proffered evidence strongly suggests that Horton fired a gun during the August 2012 shooting.

Third, Horton nowhere disputes seriously the allegation that he attempted to stab a rival gang member with a kitchen knife during an altercation on a subway platform near Gun Hill

---

[94]     DI 432, at 12:17-19 ("These are a group of gang members updating each other on exactly who was doing what and really the progress of their ongoing war at the time with the Big Money Bosses . . . .").

[95]     *Id.*

Road.[96]  Defense counsel merely contends that nothing in the proffered testimony of the cooperating witness who personally observed the incident[97] suggests that it occurred after 2014.  Even if the attempted stabbing took place two or more years ago, however, the Court credits the witness's proffered testimony and finds that it tends to establish Horton's dangerous propensity for violence. The same witness will testify, based on personal knowledge, that Horton committed two street robberies and engaged in another violent altercation with a rival gang.  The Court credits these assertions and finds that they similarly tend to show Horton's propensity for violence.

Fourth, Horton does not dispute that his then-girlfriend filed a domestic incident report against him in April 2015, alleging that he slapped, punched, and dragged her down the stairs, leaving bruises and scratches on her body, and was escalating the violence at the time she reported it.  Defense counsel disputes the credibility of the report, but at the same time claims that the complainant views the incident as "long forgotten" and does not believe Horton presents a danger. Presented only with defense counsel's unsubstantiated claims, the Court credits the government's proffer with respect to the alleged domestic violence incident and finds that it "offers probative evidence of a tendency to violence and dangerousness toward others."[98]

Fifth, according to the government's proffer, Horton owned at least one gun that other 2Fly members were permitted to use.  Defense counsel denied that allegation and challenged it primarily with two pieces of proffered evidence: (a) the testimony of Horton's mother about never

---

[96]      The only denial Horton offers is defense counsel's blanket denial of all of the government's allegations.  *See* DI 437, at 6 ("The government's motion for detention rests on a number of allegations, all of which Mr. Horton denies.").

[97]      DI 465-1 ¶ 2(i).

[98]      *Mercedes*, 254 F.3d at 437 (quoting *United States v. Quartermaine*, 913 F.2d 910, 917 (11th Cir. 1990)).

seeing a gun stashed in their sofa, and (b) the fact that searches of Horton's apartment never yielded a gun. The Court credits for these purposes defense counsel's proffer that Horton's mother would so testify, but nonetheless finds it unpersuasive. The government expects that cooperating witnesses will testify that they observed Horton in possession of a firearm on many occasions, including in his home, at the apartment of another 2Fly member, and concealed in a trash can near the playground where Horton and others allegedly sold drugs. According to that proffered testimony, which the Court credits, Horton permitted other 2Fly members to use his gun in furtherance of the gang's interests.

The government points also to posts from Horton's Facebook account from 2014 in which, the government contends, Horton asserted his willingness to use a gun (*e.g.*, "This gLock hold 16 ain't no running bullets coming") and his commitment to never stop feuding with rival gang Big Money Bosses ("Beef Neva Gon sTop #biGmoneyK").[99] One post in which Horton allegedly referenced possessing a gun ("nothing 'beats' but my glock nicca") was made after Horton's move to Manhattan, "further rebut[ting] the defendant's claims to have abandoned his violent ways when he moved out of the Bronx in 2014."[100]

There is proffered evidence also that Horton remained involved with firearms as recently as March 2016. The government submitted line sheets of a call on March 9, allegedly between Laquan Parrish and Horton, in which Parrish told Horton he needed "that"—which the government understands to be a gun—for a "situation."[101] Defense counsel objected to the

---

[99] DI 477-1.

[100] DI 477, at 2.

[101] DI 358-1, at 4-7.

government's interpretation, positing instead that the conversation was about McDonald's hamburgers.[102]  The Court finds counsel's interpretation unpersuasive.  The government bolstered its interpretation with the sworn declaration of Detective Jeselson, an officer with 19 years of experience, who said that in his experience, gang members such as Parrish "often avoid expressly naming firearms during telephone conversations due to a general concern with possible interception."[103]  Detective Jeselson concluded also that Parrish's reference to the object as "that" "would be consistent with the manner in which a gang member would request a firearm, but inconsistent with requesting an innocent object[, like a hamburger,] that could be named without fear of generating incriminating evidence."[104]  The government contends that this interpretation is corroborated by its proffer that, after intercepting a call in which Parrish told a co-defendant that he "need[ed] that," the police conducted a search of that co-defendant's apartment and recovered a firearm.  For the reasons the government proffers, the Court credits the government's interpretation of the March 9 call and finds that Horton's recent involvement with firearms weighs in favor of finding that he is a serious danger to the community.

Weighing in favor of Horton is the fact that he has no prior criminal convictions; he was, at the time of his arrest, attending community college; recently, he had been offered employment and had been recommended for approval to enlist in the Army; and, with the exception

---

While defense counsel disputed that Horton, initially labeled as "Brady" on the line sheets, was on those calls, the Court accepts that he was for the reasons set forth by the government.  *See supra* note 17.

[102]    DI 432, at 36:18-20.

[103]    DI 465-2 ¶ 4(b).

[104]    DI 465-2 ¶ 4(b).

28

of the March 2016 calls, the alleged gang conduct the government cites in support of dangerousness occurred prior to his move to Manhattan two years ago.  The Court credits each of those representations.  Nevertheless, in view of all the proffered evidence of Horton's tendency for violence and dangerousness toward others, the Court finds that Horton poses a serious danger to the community if released.  In consequence, this factor weighs in favor of detention.

B.      *Nature and Circumstances of the Charged Offenses*

Horton is charged with serious crimes.[105]  He faces a mandatory minimum of 10 years on the firearms charge, 10 years on the most serious narcotics conspiracy charge, and 20 years on the most serious distribution charge.[106]  He faces a maximum of 20 years on the racketeering charge and life if convicted on the most serious distribution charge.[107]  The fact that Horton is charged with selling drugs and possessing and using firearms—within close proximity to a school and playground—in furtherance of 2Fly's gang activities weighs in favor of detention.

C.      *Weight of the Evidence*

Defense counsel has stated repeatedly throughout these proceedings that Horton is presumed innocent of the charges against him, as this Court is well aware.  The issue now before

---

[105]

DI 5.

[106]

*See* 18 U.S.C. § 924(c)(1)(A); 21 U.S.C. § 841(b)(1)(A); 21 U.S.C. § 860(a).  Assuming Horton were convicted of the least serious narcotics conspiracy and distribution charges, he would face no mandatory minimum and a minimum of one year, respectively.  *See* 21 U.S.C. § 841(b)(1)(C); 21 U.S.C. § 860(a).  If he were convicted of the marijuana conspiracy and distribution charges, he would face a mandatory minimum of 5 years and 10 years, respectively.  *See* 21 U.S.C. § 841(b)(1)(B); 21 U.S.C. § 860(a).

[107]

*See* 18 U.S.C. § 924(c)(1)(A); 18 U.S.C. § 1963; 21 U.S.C. § 841(b)(1)(A).

the Court is whether there would be a sufficient risk Horton would endanger the community if he were released pending trial to warrant detention, not whether he is guilty or innocent of the charges in the indictment.[108]  While defense counsel takes issue with the form in which the government presented its evidence against Horton, namely by proffer, he offers little more than unsworn and conclusory denials of the government's substantive information.

As more fully detailed above, Horton does not dispute seriously that: (a) 2Fly is a violent street gang, (2) he was a member of 2Fly at least until 2014, (c) he was present at a violent altercation between 2Fly and a rival gang that resulted in a fatal stabbing, (d) he was present at a violent altercation between 2Fly and a rival gang that resulted in three people being shot, and (e) during yet another violent altercation, he attempted to stab a rival gang member with a kitchen knife. The denials defense counsel does offer are unpersuasive in view of the government's detailed proffer.  For example, according to the government's proffer and the sworn declarations of Special Agent Pasuco and Detective Jeselson, a cooperating witness with whom Horton underwent an initiation ritual into 2Fly will confirm that Horton is a member of that violent street gang and will testify that he personally observed Horton engaging in activities such as drug sales, drug purchases, violent altercations, and gun possession, among other things.[109]  As discussed above, the Court credits also the government's interpretation of wiretapped phone calls.  Those calls suggest that Horton remained involved in 2Fly as recently as March 2016 and that he held a gun for 2Fly's use. In view of the government's considerable proffered evidence of Horton's participation in 2Fly's gang activities, the Court finds that the weight of the evidence favors detention.

---

[108] *Bellomo*, 944 F. Supp. at 1163.

[109] DI 465-1.

30

*D.      History and Characteristics of the Defendant*

Defense counsel proffered that (a) Horton is a person with close ties to his family and community, (b) up until his arrest, he attended community college full-time, and shortly before his arrest he was offered employment, (c) before starting college in early 2016, he held jobs at McDonald's, Duane Reade, and the New York Public Library, and (d) he has no prior criminal convictions. The Court credits those representations.[110] Undoubtedly, those facts weigh in Horton's favor and against detention. Defense counsel contends also that Horton turned over a new leaf in 2014 when his family moved from the Bronx to Manhattan. Here, the Court disagrees. The Court finds persuasive the government's proffered evidence that Horton continued to travel to the Bronx in order to interact with members of 2Fly, including its alleged leader, and engage in gang activities more than two years after Horton claims to have severed ties with 2Fly.[111] And as the government has noted, Horton was employed, in high school, or both when he allegedly participated in 2Fly's activities back in 2014 and earlier. Although considerations exist on both sides, the Court finds that overall this factor tips in favor of detention.

*IV.     Inadequacy of Conditions*

Horton urges that the Court order release on the same conditions entered by the magistrate judge. In the face of considerable proffered evidence that Horton presents a danger to

---

[110]

These aspects of counsel's proffer were corroborated at least partially by documentary evidence submitted to the Court.

[111]

DI 358, at 8-9; *see, e.g.*, DI 358-1, at 4 ("[HORTON to PARRISH]: . . . "I'm in the V. . . . I'm in the Valley."); DI 358-1, at 10 ("[HORTON to PARRISH: . . . I'll slide on right now."); DI 358-1, at 17 ("[HORTON to PARRISH]: . . . I'm in the hood. You know where I'm at.").

the community, electronic monitoring, home detention, and assurances from his mother that he would comply with the requirements of pretrial release, along with any other condition, is insufficient.[112]   The proposed supervision would be inadequate, and the proposed electronic surveillance could be circumvented.[113]   Incarceration is the only viable method to ensure that Horton is unable to carry out criminal activity that would endanger persons in the community.

*Conclusion*

The Court has reconsidered the matter of bail for this defendant as directed by the Court of Appeals' mandate.  It agrees with the Court of Appeals' previous observation that "there are particular facts and circumstances that militate in favor of release; and other particular facts and circumstances that militate in favor of detention."[114]   It now concludes—with the benefit of additional evidence and extensive additional briefing and argument—that the bail issue is no longer as close as it was on the limited record that was before the Circuit previously.  It again finds, by clear and convincing evidence and applying the legal standard articulated by the Court of Appeals, that no condition or combination of conditions would reasonably assure the safety of the community if Horton were released.  In view of this conclusion, it is unnecessary to express any view as to risk of flight.  The Court reserves that issue for subsequent proceedings should that prove necessary.

---

[112]

*Mercedes*, 254 F.3d at 437.

[113]

*United States v. Orena*, 986 F.2d 628, 632 (2d Cir. 1993).

[114]

*Horton*, 2016 WL 3476634, at *2.

32

The defendant shall be detained pending trial.

SO ORDERED.

Dated:        October 20, 2016

Lewis A. Kaplan
United States District Judge

(The manuscript signature above is not an image of the signature on the original document in the Court file.)